Whitfield GRAVES, Appellant,

v.

UNITED STATES, Appellee.

No. 82–93.

District of Columbia Court of Appeals.

Argued Feb. 9, 1983.

Decided Jan. 11, 1984.

Holly Skolnick, Public Defender Service, Washington, D.C., with whom A. Franklin Burgess, Public Defender Service, Washington, D.C., at the time the brief was filed, was on brief, for appellant.

Thomas J. Tourish, Jr., Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, and Judith Hetherton and Steven D. Gordon, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before KERN, MACK and FERREN, Associate Judges.

FERREN, Associate Judge:

While awaiting trial on murder, burglary, and robbery charges, appellant was granted use and derivative use immunity and ordered to testify at the earlier, separate trial of a codefendant. Appellant refused to testify, and the court held him in criminal contempt. On appeal, he argues that his conviction cannot stand because the only way he could adequately safeguard his Fifth Amendment privilege against self-incrimination was to remain silent. We disagree. A duly authorized assurance of immunity is sufficient to supplant the Fifth Amendment privilege because it proscribes any use—direct or indirect—of the compelled testimony against the witness.

Thus, an immunized witness/defendant must testify at his codefendant's earlier, separate trial. Later, at a pretrial hearing in his own case, the witness/defendant may question the government's ability to comply with that proscription, and the government must carry the heavy burden of convincing the court that its evidence is derived from sources wholly independent of the immunized witness' testimony. Because appellant refused to testify at his codefendant's trial, rather than follow the appropriate pretrial procedure for raising his claim of the government's "inevitable use" of the compelled, immunized testimony at his own trial, we affirm his conviction of criminal contempt.

I.

Indictments charged appellant and two codefendants with felony murder, D.C.Code § 22–2401 (1973), first degree burglary, id. § 22–1801(a), and robbery, id., § 22–2901. The three cases were severed and scheduled for separate trials. Before appellant's trial, the government sought and obtained an order from the United States District Court for the District of Columbia granting him use and derivative use immunity in exchange for his testimony at the earlier trial of his codefendant, Larry Brown.[1]

---

1. The court granted immunity pursuant to 18 U.S.C. §§ 6002–6003 (1976).

§ 6002. Immunity generally

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

(1) a court or grand jury of the United States,

(2) an agency of the United States, or

(3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,

and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the

witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

§ 6003. Court and grand jury proceedings

(a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon the request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

(b) A United States attorney may, with the approval of the Attorney General, the Deputy

After dismissing the jury on the first day of Brown's trial, the court summoned appellant and his counsel to the courtroom to determine whether appellant would testify when called by the government. Counsel stated that appellant's decision was "not to testify in this case." Counsel asserted that appellant's testimony inevitably would be "used" against him in his own pending case, and thus the grant of immunity was not coextensive with his Fifth Amendment privilege against self-incrimination.

After hearing the prosecutor's argument that appellant's testimony could be compelled under the grant of immunity, the trial court asked whether defense counsel had advised appellant "as to the nature and extent of the immunity granted, and what it means." Counsel answered affirmatively and also stated he had advised appellant that, in any event, to assert his Fifth Amendment privilege appellant at least must be sworn and then personally invoke the privilege.

When the clerk called appellant and told him to raise his hand, however, appellant said, "I don't understand what's happening here." At that point, the trial court granted a five minute recess so that counsel could consult again with appellant. The court reconvened and defense counsel stated, "I spoke to Mr. Graves, again advised him of what this hearing was all about, and told him what was required, and it is his decision, and not with my advice, let the record be clear on that, that he won't even take the oath." The court then read to appellant the order compelling his testimony and granting immunity. When asked to stand and raise his right hand, appellant stood and replied, "No, Ma'am." Brown's trial resumed without appellant's testimony.

Several months later, following a stipulated trial pursuant to its order to show cause why appellant should not be held in contempt, the court found appellant guilty of criminal contempt for "refus[ing] to be sworn and refus[ing] to testify" at Brown's trial.[2] The court found that appellant was fully apprised of the immunity grant, that he had refused to be sworn and to testify "after being advised by counsel with a full understanding of the proceeding," and that appellant's actions were "contemptuous . . . beyond a reasonable doubt."

II.

On appeal, appellant cites the fact that he had been indicted but not yet tried at the time the court ordered him to testify at the Brown trial, and that he was scheduled to be tried by the same prosecutor, before the same judge, who tried Brown. He argues that, as a result, it was "simply inconceivable," despite the express grant of immunity, that his compelled testimony would not have been "used" in his subsequent prosecution. Merely by hearing appellant's testimony, the prosecutor inevitably would use it "in focusing on any further investigation, in deciding whether to pursue plea negotiations, in planning his cross-examination, or other trial strategy." Additionally, he says, the trial judge "could not have avoided" being influenced by, and thus using, his testimony at the Brown trial in making discretionary rulings in appellant's own murder trial. In short, appellant states that it would be "impossible as a matter of human nature" for the prosecutor and the trial judge to erase their knowledge of his compelled testimony and not use it; thus, the immunity granted him was not coexten-

Attorney General, or any designated Assistant Attorney General, request an order under subsection (a) of this section when in his judgment—

   (1) the testimony or other information from such individual may be necessary to the public interest; and

   (2) such individual has refused or is likely to refuse to testify or provide other informa-

tion on the basis of his privilege against self-incrimination.

2. Between the hearing on appellant's grant of immunity for testimony at Brown's trial and his own later criminal contempt trial for refusing to testify, appellant was separately tried before the same court—and convicted—on charges of murder, robbery, and burglary.

sive with his Fifth Amendment privilege, and he therefore could refuse to testify.

Underlying appellant's argument is the premise that he had no other way, short of refusal to testify at Brown's trial, to prevent the use of his compelled testimony in his own trial. We disagree. We are persuaded that, once appellant was granted immunity pursuant to 18 U.S.C. §§ 6002–6003, he was obligated to testify at the codefendant's trial. As we develop in Part III below, contrary to appellant's premise he would have had a full and fair opportunity to raise later, in connection with his own trial, the government's alleged inability to comply with the use and derivative use proscription.

We therefore do not decide whether appellant is, or is not, correct in asserting that the prosecutor inevitably, if subconsciously, would have used appellant's earlier, compelled testimony in preparing for appellant's murder trial (thus necessitating dismissal of the indictment). We hold merely that his argument, supporting his refusal to testify at the Brown trial, was premature. Under *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), and, more recently *Pillsbury Co. v. Conboy,* —— U.S. ——, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983), a duly authorized assurance of immunity pursuant to 18 U.S.C. §§ 6002–6003 is sufficient to supplant a person's Fifth Amendment privilege not to testify at a codefendant's earlier, separate trial.

### III.

In *Kastigar, supra,* 406 U.S. at 449, 92 S.Ct. at 1658, the Supreme Court confronted the question whether the statutory immunity conferred by 18 U.S.C. §§ 6002–6003 (1976) is coextensive with the scope of the Fifth Amendment privilege. The Court held that since § 6002 prohibited prosecuto-

rial authorities from using the compelled testimony in "*any* respect," the statute is coextensive with the scope of the privilege against self-incrimination and "therefore is sufficient to compel testimony over a claim of the privilege." *Id.* at 453, 92 S.Ct. at 1661 (emphasis in original).[3]

The Court recognized the government's "essential" power to compel testimony, *id.* at 444, 92 S.Ct. at 1656, for often the only persons who can give useful testimony are those who are implicated in the offense. *Id.* at 446, 92 S.Ct. at 1656.[4] This power stems from the common law principle that the public has a right to every person's evidence. It also serves to satisfy the Sixth Amendment requirement that a defendant be able to confront all witnesses against him or her. *Id.* at 443–44, 92 S.Ct. at 1655–1656. *United States v. DeDiego,* 167 U.S.App.D.C. 252, 256, 511 F.2d 818, 822 (1975).

The government's power to compel testimony is not absolute, however; it must yield to the Fifth Amendment privilege against compulsory self-incrimination. *Kastigar, supra,* 406 U.S. at 444, 92 S.Ct. at 1656. Accordingly, immunity statutes, long a "part of our constitutional fabric," *Ullman v. United States,* 350 U.S. 422, 438, 76 S.Ct. 497, 506, 100 L.Ed. 511 (1956), attempt to accommodate "the imperatives of the privilege and the legitimate demands of government to compel citizens to testify." *Kastigar, supra,* 406 U.S. at 446, 92 S.Ct. at 1656. The proper accommodation of these interests is achieved when the witness is placed in the same position as if, in the absence of the immunity grant, he or she had claimed the privilege and refused to testify. *Id.* at 458–59, 92 S.Ct. at 1663–1664; *DeDiego, supra,* 167 U.S.App.D.C. at 256, 511 F.2d at 822.

---

**3.** This court recently has reemphasized that the statute's "total prohibition on use provides a comprehensive safeguard." *United States v. Anderson,* 450 A.2d 446, 451 n. 8 (D.C.1982).

**4.** A "major purpose" of § 6002 was "to provide the criminal justice system with the necessary

legal tools ... to strengthe[n] the evidence gathering process and insur[e] that the evidence will then be available and admissible at a trial." *Pillsbury Co., supra,* 103 S.Ct. at 612 (quoting 116 Cong.Rec. 35,200 (1970) (statement of Rep. St. Germain)).

█ The Supreme Court held that §§ 6002–6003 reflect this accommodation. The Court concluded that, because the prosecutor would not be able to use the defendant's compelled testimony in *any* respect, the defendant would be in the same position as if he or she had claimed the Fifth Amendment privilege. *Pillsbury Co., supra,* 103 S.Ct. at 613; *Kastigar, supra,* 406 U.S. at 462, 92 S.Ct. at 1665.

In order to assure that a witness who testifies under an immunity grant—and is subsequently to be prosecuted for an offense about which the witness testified—stands in the same position as if he or she had invoked the Fifth Amendment privilege, the Court envisioned a procedure that would serve as a "comprehensive safeguard barring the use of compelled testimony." *Id.* at 460, 92 S.Ct. at 1664.[5] Once the government initiates prosecution against that individual on charges related to the subject matter of the testimony, a pretrial hearing is the appropriate vehicle for challenging the government's compliance with

the immunity grant.[6] As the Court in *Kastigar* made clear, after the defendant shows that he or she has given immunized testimony, the government bears the "heavy burden" of affirmatively demonstrating that its case against the defendant is derived from "wholly independent" sources. *Id.* 406 U.S. at 460–61, 92 S.Ct. at 1664–1665; *see also United States v. Anderson,* 450 A.2d 446, 451 (D.C.1982).

In holding the government to its burden, the Court instructs the "*Kastigar* hearing" judge to enforce the "sweeping proscription of any use, direct or indirect, of the compelled testimony." 406 U.S. at 460, 92 S.Ct. at 1664. This task necessarily includes a consideration of even "the subtle ways in which the compelled testimony may disadvantage a witness," thereby providing "very substantial protection, commensurate with that resulting from invoking the privilege itself." *Id.* at 459–61, 92 S.Ct. at 1664–1665.[7] If the government is unable to carry its affirmative burden, with respect to ei-

5. In *Kastigar, supra,* 406 U.S. at 460, 92 S.Ct. at 1664, the Court elaborated:

> A person accorded this immunity under 18 U.S.C. § 6002, and subsequently prosecuted, is not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities. As stated in *Murphy* [*v. Waterfront Comm'n,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964)]:
> "Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." 378 U.S. at 79, 84 S.Ct. at 1609 n. 18. This burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

6. The defendant may file a motion to suppress evidence that was illegally derived from his testimony. In a case such as this, where appellant argues that use would be inevitable and would taint any proceedings against him, a

motion to dismiss the indictment is appropriate.

7. If Congress had provided the broader transactional immunity—*i.e.,* immunity from all prosecutions relating to the subject matter of the immunized testimony—the prosecutor would have to grant blanket amnesty despite independent evidentiary sources sufficient to convict the witness. Such immunity would afford the individual more protection than the Fifth Amendment does, since the Fifth Amendment, like the narrower grant of use and derivative use immunity, permits the prosecutor to proceed against the witness with untainted evidence. *Kastigar, supra,* 406 U.S. at 453, 461–62, 92 S.Ct. at 1665. Because transactional immunity exceeds the constitutional requirements of the Fifth Amendment, it interferes with the prosecutor's discretion to choose to compel testimony and then demonstrate, in a later prosecution, that its case is untainted. *See Pillsbury Co.,* 103 S.Ct. at 616. The prosecutor, of course, risks being unable to satisfy the heavy burden of showing wholly independent sources in the later prosecution; but that is the risk to be taken when requesting a grant of use immunity—a risk presumably worth taking, in many instances, instead of the all-or-nothing approach of transactional immunity.

ther direct or indirect use, the trial court must dismiss the charges.[8]

The critical focus, therefore, is on the fact that compelling an individual to testify under immunity does not, in itself, violate a constitutional right. Any constitutional violation would lie in using the compelled testimony against the individual. Before the *Kastigar* hearing, it is not possible to determine whether the government will pursue the prosecution using compelled testimony. *United States v. Kember,* 208 U.S. App.D.C. 380, 389, 648 F.2d 1354, 1363 (1980) (per curiam). Thus, there can be no basis for concluding that a constitutional violation has occurred unless the government actually takes the immunized individual, such as appellant, to trial.[9] Until that time, "the Government's ripeness argument must prevail." *Kember, supra,* 208 U.S. App.D.C. at 389, 648 F.2d at 1363; *In re Liddy,* 165 U.S.App.D.C. 254, 266–67, 506 F.2d 1293, 1305–06 (1974) (en banc). *See also Goldberg v. United States,* 472 F.2d 513 (2d Cir.1973); *United States v. Wilson,* 488 F.2d 1231 (2d Cir.1973), *rev'd on other grounds,* 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975); *United States v. Pappadio,* 346 F.2d 5 (2d Cir.1965); *Buonacoure v. United States,* 412 F.Supp. 904 (E.D.Pa. 1976). Otherwise, we would, in effect, be "pre-determin[ing]" the decision of the court in a subsequent criminal prosecution on the question whether the Government has met its burden of proving 'that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.'" *Pillsbury Co., supra,* 103 S.Ct. at 616 (quoting *Kastigar, supra,* 406 U.S. at 460, 92 S.Ct. at 1664).

It follows that, because the *Kastigar* hearing assures that the government cannot use immunized testimony, the witness can be held in contempt for refusing to testify at an earlier trial under an immunity grant.[10] The possibility that the government may have to drop its charges does not justify appellant's contumaciousness. *Buonacoure, supra,* 412 F.Supp. at 908. The Constitution does not require the prosecutor to choose between prosecuting a defendant while "forfeit[ing] the right to valuable knowledge he may possess" and compelling his testimony but forfeiting the right to prosecute, even when there is a sufficient case against the defendant derived from legitimate sources wholly independent of the compelled testimony. *Id.* Instead, discretion is placed with the prosecutor, who may choose to compel a defendant's immunized testimony at his codefendant's earlier trial, and thus run the risk of not being able to carry the substantial burden of demonstrating independent sources of such evidence for use at the defendant's later trial. *See De Diego, supra,* 167 U.S.App.D.C. at 258–59, 511 F.2d at 824–25. That choice is for the prosecutor to make; the court cannot preempt that decision by mandating what would be, in effect, a grant of transactional immunity, which "is precisely the kind of immunity Congress intended to prohibit." *Pillsbury Co.,* 103 S.Ct. at 616; *see Buonacoure, supra,* 412 F.Supp. at 907–08; note 7 *supra.*

## IV.

Appellant cites the Supreme Court's recent decision in *Pillsbury Co., supra,* 103 S.Ct. 608, for the proposition that, instead

---

**8.** We have previously approved the trial court's dismissal of an indictment for an offense related to the subject matter of a defendant's immunized testimony. *United States v. Warren,* 373 A.2d 874, 877 (D.C.1977) ("the government did not meet its burden under *Kastigar* and *McDaniel* [482 F.2d 305 (8th Cir.1973)] of proving that the evidence it proposed to use against appellee was not in any way derived from the information he provided with respect to the charged offenses.")

**9.** At that time, the individual does not have to show that the government used tainted evidence. Upon showing that he or she testified under an immunity grant, the burden shifts to the prosecutor to show that the case is derived from wholly independent sources. *See* note 5 *supra.*

**10.** The "only alternative" to testifying under an immunity grant is a contempt citation. *United States v. Leonard,* 161 U.S.App.D.C. 36, 53–54, 494 F.2d 955, 972–73 (1974).

of reading *Kastigar* to make all Fifth Amendment claims premature until the time of the witness' own trial, a "risk analysis" is required when a witness is to be compelled to testify. Pursuant to such analysis, if the danger of incrimination is only "remote and speculative," the witness must testify, but if the danger is "real" the witness may stand on the Fifth Amendment privilege and refuse to testify. Thus, appellant contends, despite a facially valid grant of immunity, the inquiring court must make a case-by-case analysis before holding a defendant in contempt for refusing to testify.

*Pillsbury Co., supra,* does not mandate such a result. In that case, respondent Conboy, under a grant of use and derivative use immunity, testified before a grand jury investigating price-fixing activities. In civil antitrust actions concerning the same events, the District Court made Conboy's grand jury testimony available to the parties' attorneys, including counsel for petitioner Pillsbury Co. Pursuant to a subpoena, Conboy appeared for a deposition, where Pillsbury Co.'s counsel sought to question him about his immunized grand jury testimony. Asserting his Fifth Amendment privilege, Conboy refused to answer. The District Court granted Pillsbury Co.'s motion to compel Conboy to answer, but he persisted in his silence. The court held him in contempt. The Court of Appeals reversed.

In the Supreme Court, the parties debated whether Conboy's deposition testimony (if he had testified) would have derived from his immunized grand jury testimony and thus been unavailable for use in subsequent criminal proceedings against him. The Court, however, focused on the "crux of their dispute[:] . . . whether the earlier grant of immunity itself compelled Conboy to talk" at the deposition. 103 S.Ct. at 614. The Court answered that question in the negative, since "the original grant of immunity does not extend to the subsequent civil proceeding." *Id.* at 614 n. 13. Thus, the Court affirmed the reversal of Conboy's

contempt conviction: "a District Court cannot compel Conboy to answer deposition questions, over a valid assertion of his Fifth Amendment right, absent a duly authorized assurance of immunity at the time." *Id.* at 614 (footnote omitted).

Contrary to appellant's assertion, the Court did not hold that the immunity granted pursuant to § 6002 was insufficient to protect Conboy. Rather, it held that Conboy's civil deposition was not immunized. Conboy had not been afforded "certain protection" of his Fifth Amendment privilege because he did not have a "duly authorized assurance of immunity." *Id.* at 614, 616. In contrast, appellant received assurance that he was protected against use of compelled testimony, given his grant of immunity under § 6002 and his right to a pretrial "*Kastigar* hearing."

Appellant also relies on two cases from the United States Court of Appeals for the District of Columbia Circuit: *Kember, supra,* and *Liddy, supra.* In *Kember,* the defendants had been convicted of one offense, but an agreement they made with the government permitted their prosecution for other offenses if the first conviction was overturned on appeal. In *Liddy,* the defendant had been convicted but awaited sentencing when ordered to testify. In both cases the defendants had refused to testify even though granted immunity because, they contended, they were not adequately protected from subsequent use of their compelled testimony. The Court of Appeals ruled in each instance that the defendants' arguments about inevitable government use of their testimony were not ripe. *Kember, supra,* 208 U.S.App.D.C. at 389; 648 F.2d at 1363; *Liddy, supra,* 165 U.S.App.D.C. at 265–67, 506 F.2d at 1304–06 (citing *Goldberg, supra,* 472 F.2d at 513). "The *Kastigar*-style hearing to which appellants are entitled in any further proceedings is a safeguard against violation of their Fifth Amendment right. We cannot . . . conclu[de] that appellants are entitled to more." *Kember, supra,* 208 U.S.App.D.C. at 389, 648 F.2d at 1363.

Appellant emphasizes that the federal circuit court expressly reserved the question "whether an *indicted* defendant as opposed to a *convicted* one, could be compelled to testify...." *Kember, supra,* 208 U.S.App. D.C. at 388, 648 F.2d at 1362; *accord Liddy, supra,* 165 U.S.App.D.C. at 261, 506 F.2d at 1380. We are not constrained by the circuit court's references to situations not before it. In any event, we believe the rule stated in those cases is equally applicable in the present situation. Once granted a duly authorized assurance of immunity, an indicted but untried defendant must testify, as ordered, and then challenge the government's compliance at a later *Kastigar* hearing before his or her own trial.[11]

### V.

■ Appellant advances an argument related to his Fifth Amendment concern. He stresses that if he is compelled to testify before his trial, he inevitably will reveal his trial strategy and give the government a preview of his responses and demeanor. This, he contends, amounts to a violation of his Sixth Amendment right to the effective assistance of counsel. *See United States v. Levy,* 577 F.2d 200 (3d Cir.1978). We decline to speculate on the merits of this argument, for it is also premature. It should be advanced at the *Kastigar* hearing. *See Kember, supra,* 208 U.S.App.D.C. at 390–91; 648 F.2d at 1364–65.

### VI.

■ Finally, we are unpersuaded by appellant's contention that the government did not show that his refusal to be sworn and to testify was wilful contempt. The

record demonstrates that the trial judge and the prosecutor advised appellant in open court that he must be sworn and testify. Defense counsel stated on the record that he had told appellant "what was required" and "it is [appellant's] decision ... that he won't even take the oath." When the court said to appellant, "You are instructed to be sworn and to testify in this case or be held in contempt," appellant expressly refused. The evidence is sufficient to support a finding that appellant's refusal was wilful and thus contumacious beyond a reasonable doubt.

### VII.

In sum, appellant's refusal to testify was not justified by his Fifth Amendment privilege. Because he was assured that the grant of immunity pursuant to 18 U.S.C. §§ 6002–6003 was sufficient to protect him from any use of his compelled testimony, his arguments at the Brown trial were premature. They should have awaited a *Kastigar* hearing before trial of the criminal charges against him.

If appellant's "inevitable use" argument is persuasive—as our dissenting colleague reasons it is—then presumably, if appellant had testified at the Brown trial, he could have persuaded the court at his own pretrial *Kastigar* hearing that his indictment should be dismissed. The point is, under 18 U.S.C. §§ 6002–6003, the government had a right to compel appellant's immunized testimony at the Brown trial, at the risk of sacrificing appellant's own indictment. Appellant thwarted the government's right. Accordingly, appellant's conviction for criminal contempt is

*Affirmed.*

---

**11.** Appellant also cites *United States v. McDaniel,* 482 F.2d 305 (8th Cir.1973) and *United States v. Dornau,* 359 F.Supp. 684 (S.D.N.Y. 1973), *rev'd on other grounds,* 491 F.2d 473 (2d Cir.1974), to support his assertion that non-evidentiary use of his compelled testimony would have been inevitable in his impending trial. Both cases concerned challenges to the defendants' indictments, which the courts dismissed because the government could not discharge its heavy burden of proving that compelled testimony had not been used. Nowhere in these

cases is there support for appellant's contention that a refusal to testify is justified if such use is inevitable. Instead, they support our conclusion that the proper place for appellant's arguments is at a *Kastigar* hearing on a motion to dismiss his indictment.

The only case appellant cites directly supporting his contention that his refusal to testify was not contumacious is *United States v. Kim,* 471 F.Supp. 467 (D.D.C.1979). We are, of course, not bound by *Kim.* In any event, we are unpersuaded and decline to follow it.

MACK, Associate Judge, dissenting:

In my view, a simple restatement of the facts will point out, as clearly as any legal argument, why I cannot join the majority in affirming appellant's conviction for criminal contempt.

Appellant was indicted with Larry Brown and another codefendant for felony murder and related crimes. The cases against all three men were severed for separate trials. Larry Brown was brought to trial first and appellant, while awaiting trial on the same offense before the same judge and the same prosecutor, was granted immunity by the government (18 U.S.C. § 6002) and ordered to testify at the trial of Brown. When appellant, relying on his constitutional privilege against self-incrimination, refused to be sworn or to testify he was convicted for criminal contempt.

Appellant argued in the trial court, and he argues here, that under this factual pattern it is inconceivable that the purported grant of immunity could protect him against compulsory self-incrimination. I agree.

The majority, in finding appellant's argument to be premature under *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), disregards two cardinal tenets of decisionmaking which *Kastigar* expressly recognizes—(1) that *facts* determine precise issues (*id.* at 457, 92 S.Ct. at 1663) and (2) that consistency of holdings on a conceptual basis is desirable (*id.* at 453, 92 S.Ct. at 1661).

This case is not *Kastigar*. *Kastigar,* in holding that testimony could be compelled when its use or derivative use was prohibited in any criminal case was contemplating future prosecutions or subsequently prosecuted cases (*id.* at 452–53, 92 S.Ct. at 1660–1661) at which time the government, pretrial, would have the affirmative duty to prove that the evidence it was proposing to use was derived from a legitimate source wholly independent of the compelled testimony (*id.* at 460, 92 S.Ct. at 1664). *Kastigar* was decided in the factual context of unwilling witnesses held in civil contempt (28 U.S.C. § 1826) before a grand jury. "The appellants [there] were not parties to any judicial proceeding. They were witnesses called upon to give evidence, *if any they had* of *possible* violations of laws of the United States." *Stewart v. United States,* 440 F.2d 954, 957 (1971), *aff'd,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (emphasis added). In that factual context, the risk of self-incrimination was so speculative that it could not outweigh the need for obtaining information, when coupled with a grant of immunity and the requirement that the government show an independent source in the event of future prosecution.

*Kastigar* is not and could not be controlling in the instant case because of the difference between the threat of use and the fait accompli. Here, in a basic criminal context we are not faced with conjecture.[1] Indeed, the facts here are such that the purported grant of immunity was nothing more than a formal gesture with minimal substance. At the time appellant was sub-

---

[1] In none of the cases that have held that the grant of *Kastigar* immunity will protect a criminal defendant had that defendant been awaiting trial. Thus, in *In re Liddy,* 165 U.S.App.D.C. 254, 506 F.2d 1293 (1974) the use of Liddy's testimony was speculative because Liddy had previously been convicted of crimes, the outcome of his appeal and a need for retrial was uncertain, and he had not been indicted for further crimes. With respect to his posture as a defendant, the circuit court said:

> While we think the analogy between a defendant standing trial and a "defendant" appearing before the grand jury is an imperfect one, we recognize that there is respectable authority for the proposition that one who has been formally charged may not be called before the grand jury to testify about his alleged crimes unless he knowingly consents. However, we need not decide whether we should lend our imprimatur to this proposition, for even if we were to do so, Liddy, would not benefit thereby. Liddy is not in the position of one who has been indicted and, *before facing trial,* has been called to testify before the indicting grand jury. Rather, Liddy has been indicted *and convicted* for

poenaed to testify in his codefendant's trial, the Assistant United States Attorney prosecuting that case was scheduled to prosecute appellant at his pending trial before the same judge. The testimony the government sought to compel formed the basis for appellant's pending prosecution. Once the appellant took the stand in this first trial, the risk of self-incrimination would become more than a risk; incrimination would enter the realm of reality. Putting aside for the moment the substance of the evidence, it strains credulity to believe that a good prosecutor could or would not "use" this testimony in focusing on further investigation, or in nonevidentiary ways such as deciding whether to pursue plea negotiation, preparing cross-examination, or planning trial strategy. *See United States v. Anderson,* 450 A.2d 446, 452 (D.C.1982). But more important, the prosecutor's exposure alone constitutes "use," which eliminates the need for a *Kastigar* hearing. This is the rationale of *United States v. McDaniel,* 482 F.2d 305 (8th Cir.1973) (the prosecutor's reasoning of immunized grand jury testimony by a defendant prior to trial was a *per se* use of his testimony obviating any need for a *Kastigar* hearing). *See also* our decision in *United States v. Warren,* 373 A.2d 874, 877 (D.C.1977) (citing with approval the *McDaniel* analysis, in concluding that the government did not and impliedly could not, meet its burden of proof of an independent source under *Kastigar*). Also instructive is the case of *United States v. Kember,* 208 U.S.App.D.C. 380, 648 F.2d 1354 (1980), where the circuit court, while accepting the government's ripeness argument on the basis of the facts before it[2] and distinguishing

the *McDaniel* case on other grounds[3] also noted:

> In cases such as *United States v. McDaniel* . . . the witness prevailed at the subsequent proceeding without an evidentiary hearing because, under the facts of those cases, there was no conceivable showing that the Government could make to prove an absence of taint. All of these cases involved circumstances in which use admittedly had been made of immunized testimony. Therefore, there was no set of facts the Government could possibly adduce to discharge its burden of showing a lack of taint. . . . In *McDaniel,* the same federal prosecutor who had seen defendant's immunized testimony was now prosecuting him. . . . *Where the taint has been established, there is no point in holding an evidentiary hearing on its existence vel non.*

*United States v. Kember, supra,* 208 U.S. App.D.C. at 389, 648 F.2d at 1363 (emphasis supplied). *See also United States v. Dornau,* 359 F.Supp. 684 (S.D.N.Y.1973), *rev'd on other grounds,* 491 F.2d 473 (1974) (the reading of immunized testimony was a use).

Compounding the problem of use here by the prosecutor is the problem of use by the trial court. That court, having heard appellant's testimony, could not have avoided "using" it in the discretionary rulings necessary to the conduct of appellant's trial.[4] As a practical matter, had appellant testified at his codefendant's trial, his compelled testimony would have become part of his own prosecution—testimony, ironically, which the government could not have compelled absent the fact of severance.

---

the crimes about which the grand jury now seeks his testimony.
*Id.* at 260–61, 506 F.2d 1299–1300 (emphasis in original, footnotes omitted).

2. The court in *Kember* found appellant's situation to be closer to Liddy's (*see* note 3 *infra*) than to that of an indicted defendant *awaiting* trial. 208 U.S.App.D.C. at 388, 648 F.2d at 1362.

3. The court in *Kember* also made reference to an added distinction between witnesses testifying over objection and witnesses seeking to remain silent.

4. In *United States v. Wilson,* 488 F.2d 1231 (2d Cir.1973), *rev'd on other grounds,* 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975), the Second Circuit upheld a contempt conviction for Wilson's refusal, *after* entering a guilty plea but before sentencing, to testify at the trial of a codefendant presided over by the same judge who would be sentencing Wilson. The appellate court noted however that the proper procedure would have been for Wilson to testify and then request sentencing by a different judge.

*But see United States v. Kim,* 471 F.Supp. 467 (D.D.C.1979), where the District Court for the District of Columbia held that Kim, who

In this state of facts, the solution which the majority advances is no solution at all. Compulsion here does not serve the interest of the government or the witness. The grant of immunity simply could not " 'leave[ ] the witness and the . . . Government in substantially the same position as if the witness had claimed his privilege' in the absence of a grant of immunity." *See Pillsbury Co. v. Conboy*, —— U.S. ——, 103 S.Ct. 608, 613, 74 L.Ed.2d 430 (1983) (quoting *Kastigar, supra,* 406 U.S. at 458–59, 92 S.Ct. at 1663–1664). At a *Kastigar* hearing the government would have been faced with an insurmountable task of proving " 'that the evidence . . . [was] derived from a legitimate source wholly independent of the compelled testimony.' " *Conboy, supra,* 103 S.Ct. at 616 (quoting *Kastigar, supra,* 406 U.S. at 460, 92 S.Ct. at 1664). Moreover, for appellant, "all would [have] be[en] over but the shouting." The situation is akin to that described in *Conboy, supra,* 103 S.Ct. at 617:

> As the Court stated in *Maness v. Meyers,* 419 U.S. 449, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975), compelling a witness to testify in "reliance upon a later objection or motion to suppress would 'let the cat out' with no assurance whatever of putting it back." *Id.* at 463, 95 S.Ct. at 593. We believe Conboy acted properly in maintaining his silence in the face of the District Court's compulsion order and by testing the validity of his privilege on appeal.[5]

As judicial interpretations move the criminal law inexorably on, it is therapeutic on occasion to throw out a harsh reminder. While it is well nigh impossible to rate, in order of importance, the various provisions of the Bill of Rights, it cannot be disputed that the fifth amendment protection against self-incrimination is fundamental to our system of criminal justice. It is, in fact, the reason why we have criminal trials as we know them; the rack and the screw would be much more economical. And granted that the sixth amendment rights of confrontation and compulsory process provide fundamental reasons for compulsion of testimony, "[u]nless the grant of immunity assures a witness that his incriminating testimony will not be used against him in a subsequent criminal prosecution, the witness has not received the certain protection of his Fifth Amendment privilege that he has been forced to exchange." *Conboy, supra,* 103 S.Ct. at 616. The purported grant of immunity here did not and could not afford appellant this protection.

I would reverse the conviction for contempt.

---

had already been convicted of a crime but was awaiting sentencing, was within his rights to refuse to answer questions relating to that crime before a congressional committee even though he had been granted immunity. The court found that since his testimony would have come to the attention of the sentencing judge, the grant of immunity could not "insure that the judge would not use" the information once he heard it. The court held that the grant of immunity could not supplant Kim's fifth amendment privilege and dismissed the indictment charging contempt.

5. I am reminded that a trial judge, in a different factual context, has aptly noted "even our distinguished Court of Appeals cannot unring a bell or unscramble an egg." *United States v. Brown,* 212 Wash.D.L.Rptr. 2101, 2107 (D.C. Super.Ct. Sept. 13, 1983).